## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ROMAN CATHOLIC ARCHDIOCESE
OF KANSAS CITY IN KANSAS and
SAINT ROSE PHILIPPINE DUCHESNE
CATHOLIC CHURCH,

       Plaintiffs,

v.                                  Case No. 17-2186-DDC

CITY OF MISSION WOODS,

       Defendant.

_____

## MEMORANDUM AND ORDER

      This lawsuit brings the court a dispute that pits two important values in the American experience against one another: "free exercise of religion and effective use by the state of its police powers." *Messiah Baptist Church v. Cty. of Jefferson, Colo.*, 859 F.2d 820, 823 (10th Cir. 1988) (noting the "particular protection" accorded to religious freedom by our Constitution but also noting, "The power of local governments to zone and control land is undoubtedly broad"). Over the years, Congress and the Supreme Court have rearranged the balance that courts must strike when deciding cases involving these two values.

      The current disagreement involves a recurring situation, one that requires courts to find the proper balance between these two competing values. Specifically, the parties dispute whether a municipality's exercise of its zoning power infringed on a church's religious freedom. Plaintiffs—the Roman Catholic Archdiocese of Kansas City in Kansas and St. Rose Philippine Duchesne Catholic Church—asked the City of Mission Woods, Kansas for permission to convert a single-family house into a meeting house to serve the needs of a growing congregation. The

City of Mission Woods—defendant here—refused and cited local zoning laws as its reason. Plaintiffs then filed this suit, arguing that defendant's zoning decision violates federal and state laws protecting religious exercise.

The parties now have filed cross-motions for summary judgment. *See* Docs. 39 (defendant's motion), 41 (plaintiffs' motion). The United States also has weighed in, filing an amicus brief, as allowed by 28 U.S.C. § 517. Doc. 57. It opposes defendant's motion, at least in part. Having reviewed the filings, the court is prepared to decide the motions. The court denies plaintiffs' motion and grants defendant's motion in part and denies it in part. After setting forth the facts that govern these motions, the court explains its reasoning, below.

## I.  Facts[1]

The facts recited in this section are uncontroverted.

### A.  Defendant and its Zoning Ordinances

Defendant is a Kansas municipality located in Johnson County, Kansas. It borders Kansas City, Missouri, along the eastern border of Kansas. Its boundaries occupy 60 acres of land and 180 persons reside within the city. Eighty single-family houses, four commercial buildings, the St. Rose Church, Pembroke Hill School's athletic fields, and a parking lot owned by the University of Kansas Hospital Authority are situated on the property within the city.

The city has three different zoning districts that matter to this case. First, it has a "Single Family Residential District." Properties in this district only can be used for single-family houses and certain "public" or "semipublic" uses. Approved "public" and "semipublic" uses include

---

[1]     At various times, this Order refers to certain locations within defendant's municipal boundaries. The court has attached a map of the relevant locations in Appendix A. The court takes judicial notice of these locations from Google Maps, *see Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (taking judicial notice of Google maps and satellite images), and the parties' undisputed descriptions of certain locations found in the summary judgment record.

athletic fields, churches and synagogues, community centers, libraries, parks, police stations, schools, and swimming pools. Before anyone can initiate a public use of land within the Residential District, both the City Plan Commission and City Council must approve the public use. As a prerequisite to approving a public or semipublic use, these bodies must find that:

1. The use does not materially damage or curtail the appropriate use of the neighboring property.

2. The use is compatible with the general character of the district.

3. The use does not jeopardize the public health, safety or welfare.

4. The use does not violate the general spirit and intent of the zoning ordinance and is compatible with the long-range plan used as a guide for the development of the City.

5. Adequate hard surfaced, all weather, dustless, off-street parking space is provided for the employees and patrons of the use.

6. Any other ordinance to the contrary notwithstanding, peripheral landscape screening and/or walls, and/or fences are provided at least six feet in height of sufficient depth to adequately screen the view of all proposed structures and parking facilities during the four seasons of the year from all abutting properties zoned for or developed with residential structures.

7. Structures and off-street parking areas, taken as a whole, do not occupy more than 60% of the building site, and at least 40% of the site is maintained as open, unobstructed green space.

8. Vehicular access to the use is provided only from a major thoroughfare or trafficway unless specifically waived by the City Council.

9. A landscape plan and construction details for walls and/or fences accompany the development plan and have been approved by the City Plan Commission and the City Architect.

Doc. 47-6 at 213 (Defendant City Code § 12-402(b)).

The defendant municipality has approved a public use in the Residential District just once, when Pembroke Hill School asked to use an empty lot as a soccer practice field. Pembroke Hill is a private, secular school with its main campus in Kansas City, Missouri—literally, just across the street that divides the defendant municipality and the State of Missouri. Before 1999,

Pembroke Hill had owned land within defendant's city limits that it used as a parking lot and for athletic fields. In 1999, Pembroke Hill acquired an empty field. This field adjoined the school's existing athletic fields and parking lot. All this property sits near single-family houses located in the Residential District. One can access the school's parking lot, the original athletic field, and the empty lot acquired in 1999 only from State Line Road—a busy public thoroughfare that divides Kansas and Missouri. Pembroke Hill hoped to use the empty lot to host soccer practices, but the lot was located in defendant's Residential District. Because that use amounted to a public use, the school had to secure defendant's approval before it could use the empty lot for soccer practices. Pembroke Hill formally applied for approval of this public use, and defendant conducted a series of public meetings to consider its request. During these meetings, several residents expressed concerns about the noise and light the field would generate. So, Pembroke Hill agreed to limit the lot/practice field's use to children between four and seven years old. The school also agreed to: (a) limit the hours the field could be used; (b) refrain from erecting lights or permanent goals on the field; and (c) avoid using loud speakers or whistles. Defendant then approved Pembroke Hill's request for a public use.

The second pertinent zoning district used by defendant is called the "Planned Recreation District." Defendant allows properties in this district to be used as athletic fields for amateur athletes; tennis courts; trails for running, walking, or biking; permanent restrooms; and storage facilities that support any of these uses. Any landowner who plans to devote land to one of the uses approved for the Planned Recreation District must apply for approval from the City Plan Commission and City Council. And those bodies can approve such an application only if they conclude that:

1. The use does not materially damage or curtail the appropriate use of neighboring property.

2.  The use is compatible with the general character of the district.

3.  The use does not jeopardize the public health, safety and welfare.

4.  The use does not violate the general spirit and intent of the zoning ordinance and is compatible with the long-range plan used as a guide for the development of the City.

5.  Adequate hard surfaced, all weather, dustless off-street parking [space] is provided for the patrons of the use.

*Id.* at 240 (Defendant City Code § 12-405(b)).

Defendant created the Planned Recreation District in 2006 when Pembroke Hill asked to rezone its land. Defendant approved Pembroke Hill's application, making all the school's property within defendant's municipal boundaries part of the Planned Recreation District. After defendant rezoned Pembroke Hill's land, Pembroke Hill asked defendant if it could place a soccer field and tennis courts on its property, near two houses on 51st Street—a cul-de-sac. As required by defendant's ordinance governing the Planned Recreation District, the City Plan Commission and City Council considered the school's application and held meetings so that citizens could voice support for or objections to the project. At these meetings, the owners of the homes next to the proposed tennis courts voiced concerns about their privacy. In response, Pembroke Hill agreed to plant privacy trees to shield the tennis courts from the homes. And Pembroke Hill agreed never to erect lights on or cover the tennis courts in response to concerns about light and noise emanating from the courts. After making these stipulations, defendant approved Pembroke Hill's application.

In 2012, Pembroke Hill asked defendant to allow it to expand its usage of its property in the Planned Recreation District. Specifically, the school sought to expand its existing soccer field to regulation size and construct a permanent restroom and storage facility on the property. Pembroke Hill agreed to limit the hours when it could use these fields and the permissible

volume of noise emanating from them. Defendant intended to enforce these limitations by enforcing its existing noise ordinance. In October 2016—shortly after defendant approved Pembroke Hill's 2012 request—defendant amended its noise ordinance.[2] At least one member of the City Plan Commission does not recall whether defendant amended the noise ordinance in response to Pembroke Hill's 2012 request.

The last zoning district pertinent to this case is the "Planned Office District." As the name implies, defendant permits property owners to devote property within this district to offices and parking lots for offices. One such property owner in the Planned Office District is the University of Kansas Hospital Authority. UKHA operates a clinic in Westwood—a bordering municipality. In 2006, UKHA purchased property across the street from its Westwood clinic. This newly purchased property is situated within defendant's city limits. In 2014, UKHA informed defendant that it was planning to build a parking lot on its property and applied for a permit to do so. According to a traffic study UKHA had procured, it would use the parking lot during normal business hours only. Also, drivers could access the proposed lot only from Rainbow Boulevard—a major public thoroughfare. When UKHA applied for this permit, defendant asked UKHA to change a few things about its plan. UKHA agreed. But UKHA also informed defendant that UKHA, as a state agency, need not secure any local permits to build on its property. After consulting with its lawyers, defendant decided not to challenge UKHA's position that it was exempt. Despite the exemption it claimed, UKHA met with defendant and some of its residents to address several issues they had raised about the proposed parking lot.

---

[2]       The record does not include the change imposed by this amendment.

### B.    Plaintiffs

The Roman Catholic Archdiocese of Kansas City in Kansas—the "KCK Archdiocese" for short—is a Kansas non-profit corporation and one of the two plaintiffs in this case.  The other, St. Rose Philippine Duchesne Catholic Church—"St. Rose"—is one of the KCK Archdiocese's chaplaincies.  In 2011, plaintiffs bought property within defendant's city limits. The property included an older Lutheran church and plaintiffs renovated it.  Two years later, they began holding church services in the recommissioned and renovated church.  Currently, between 600 and 800 people attend Sunday Mass at the three masses plaintiffs offer there.  Plaintiffs have various agreements with nearby properties to provide parking for its parishioners.  Also, various groups meet at the church and hold events there.  These groups—including prayer and Bible study groups—are important aspects of plaintiffs' religious practices.  They meet in the church's basement, primarily on Fridays, Saturdays, and Sundays.

The church's membership has grown since it first opened in 2013 by about 100 members. This growth has created some space constraints for the church.  In particular, more groups want to meet on Fridays, Saturdays, and Sundays than the church has capacity to handle.  Doc. 47-1 at 2 (Father Nolan Dep. at 41:14–19).  And the noise generated by the groups meeting inside the church creates some distractions.  *Id.* at 3 (95:9–96:4).  The groups meeting at the church reach the rated capacity for the rooms where they meet.  Doc 47-2 at 4 (Father Fongemie Dep. at 36:21–23).  Five or six times a year, plaintiffs have to cancel group meetings because they hold fundraisers, bake sales, festivals, and dinner events in the church basement.  Doc. 40-3 at 6–7 (Father Fongemie Dep. at 40:20–41:19).  But plaintiffs do not anticipate that their groups would meet more frequently if they had more space.  *Id.* at 6 (38:24–39:5).  Nor has any group turned away someone who wanted to join because that group lacked the space to accommodate the

potential member.  Finally, plaintiffs know of no new groups who could not meet because plaintiffs couldn't find space for them to meet in the St. Rose Church.  *Id.* (39:16–20).

### C.    Plaintiffs Buy the Meeting House

In 2015, plaintiffs acquired a house at the corner of 51st Street and Rainbow Boulevard. Rainbow is a major public thoroughfare that adjoins the church property.  51st Street is a cul-de-sac.  Plaintiffs wish to use the house it purchased on 51st Street as a meeting house.  The house is situated in the Residential District and, formally, was used as a single-family home.  All the other houses on 51st Street are single-family houses.  Under defendant's fire code, the proposed meeting house can hold as many as 115 people inside the house and another 150 people outside. Plaintiffs plan to place the main entrance to the proposed meeting house on the side facing the St. Rose Church.  A disability accessible entrance and parking space will be located on the side of the house facing 51st Street.  The proposed use for this house is unique within defendant's city limits.  Indeed, of the 80 single-family houses situated within defendant's city limits, none functions as a public use.

Because plaintiffs intended to use the meeting house in a semipublic fashion, they filed an application in 2016, asking defendant to approve this semipublic use.  The City Plan Commission and City Council held public meetings about plaintiffs' application.  At these meetings, residents expressed concerns about the number of people the meeting house could hold and the hours when it might be used.  In addition, residents worried that the meeting house would create additional traffic on the cul-de-sac.  Defendant asked plaintiffs if they would consider limiting the hours people could use the meeting house and the number of meetings that could occur there.  Defendant also asked plaintiffs if they would accept limits on the number of people who could attend meetings within the house.

Plaintiffs rejected these proposed limitations. They took the position that the normal noise ordinances ameliorated any concerns about excessive noise. And, typically, plaintiffs predicted 25 or fewer people would use the meeting house at one time. They thus asserted there was no need to impose occupant restrictions. Also, to minimize any traffic concerns, plaintiffs promised to encourage their members to refrain from parking on 51st Street—the cul-de-sac. Plaintiffs also discounted the idea that people would park on 51st Street because the meeting house's main entrance faced the church—not the cul-de-sac. Plaintiffs also produced a traffic study opining that traffic would increase minimally if plaintiffs used the structure as a meeting house. The company who produced the study cited by plaintiffs is the same company who performed the traffic study that UKHA had provided to defendant when it built its parking lot.

Defendant discounted the traffic study. But defendant never produced a study of its own. Also, defendant was not convinced that enforcing the noise ordinance and plaintiffs' traffic-mitigation efforts would dispel residents' concerns sufficiently. Doc. 40-19 at 4–5. And because plaintiffs refused to consider any limitations defendant had proposed, defendant believed plaintiffs planned to use the meeting house at all hours of the night and to permit as many people to meet inside the structure as it could hold. *Id.* So, defendant refused to allow plaintiffs to use the meeting house as a semipublic space.

This lawsuit followed.

## II.  Claims Asserted

The Complaint pleaded seven distinct causes of action. *See* Doc. 1 at 22–30. But the Pretrial Order narrowed the case, at least a little bit, omitting the Third Cause of Action. Doc. 37 at 12. The parties' summary judgment papers divide these remaining claims into two batches.

In the first batch of claims, both plaintiffs and defendant contend they deserve summary judgment. These cross-motions address the First and Second Causes of Action. On the first, the Complaint asserts that defendant imposed a substantial burden on plaintiffs' religious exercise by preventing them from using the proposed meeting house, thus violating the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). The Second Cause of Action claims that defendant treated plaintiffs on less than equal terms than defendant treated Pembroke Hill and UKHA because it granted their permit applications while denying plaintiffs' application. Plaintiffs claim this conduct violated RLUIPA's equal terms provision.

For the second batch of claims, only defendant has moved for summary judgment. It claims that the court should enter summary judgment against the claims asserted by the Fourth, Fifth, Sixth, and Seventh Causes of Action. The Fourth Cause of Action asserts that defendant violated RLUIPA by placing unreasonable limits on plaintiffs' religious exercise. The Fifth claim asserts that defendant deprived plaintiffs' right to free exercise of religion under the First Amendment in violation of 42 U.S.C. § 1983. The Sixth claim asserts that defendant violated plaintiffs' rights under § 7 of the Kansas Constitution's Bill of Rights. Plaintiffs claim defendant violated this provision, which protects plaintiffs' religious liberty, by denying their application to use the meeting house. And finally, the Seventh claim asserts that defendant violated the Kansas Preservation of Religious Freedom Act when it denied plaintiffs' application for a permit for the meeting house.

## III. Legal Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute [about] any material fact" exists and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the court views the evidence and draws

inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). A disputed "issue of fact is 'genuine' '[when] the evidence is such that a reasonable factfinder could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And an "issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party meets its initial burden, the non-moving party "'may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. To demonstrate that one or more disputed facts presents a genuine dispute for trial, the nonmovant must identify the source of the factual dispute "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips v. Calhoun*,

956 F.2d 949, 951 n.3 (10th Cir. 1992)).  To survive summary judgment, the non-moving party's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."  *Id.* (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).

The court applies this same standard when, as here, the parties have presented cross motions for summary judgment.  Each movant bears the burden to establish that no genuine issue of material fact exists on the theory adopted by its motion and that it is entitled to judgment as a matter of law.  *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).  The court must treat each motion separately, however.  Simply because the court denies one motion does not obligate the court to grant the other.  *United States v. Supreme Court of N.M.*, 839 F.3d 888, 907 (10th Cir. 2016).

Summary judgment is not a "disfavored procedural shortcut."  *Celotex*, 477 U.S. at 327.  To the contrary, it is an important procedure "designed 'to secure the just, speedy[,] and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

## IV.    Discussion

### A.    Substantial Burden under RLUIPA (First Cause of Action)

The Complaint's First Cause of Action claims that defendant violated RLUIPA's substantial burden provision.  Among other provisions, this act provides:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).

Both plaintiffs and defendant argue they deserve summary judgment on this claim.  The court disagrees with both movants.  Below, the court first explains the governing law, starting

with what constitutes a "substantial burden."  Then, the court turns to the legal standard for the test adopted in parts (A) and (B) of § 2000cc(a)(1), also known as "strict scrutiny."  Finally, the court applies these legal standards to the competing motions.  Exercising its discretion, the court decides plaintiffs' motion first and then turns to defendant's.

### 1. Governing Law

#### a. Substantial Burden

A government places a "substantial burden" on a religious institution when it denies that institution a reasonable opportunity to engage in religious activity.  *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 660–61 (10th Cir. 2006).  Mere inconvenience is not enough.  *Id.* at 662.  Whether a government has imposed a substantial burden or merely an inconvenience is a fact question that a jury must resolve.  *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1316 (10th Cir. 2010).  No Tenth Circuit case has explored where this law draws the line between "mere inconvenience" and "substantial burden"—at least not in the land-use context.[3]  But two cases from outside our Circuit provide valuable insight about this issue.

The first case is *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338 (2d Cir. 2007).  There, a religious school sought to expand to provide effective religious education.  *Id.* at 345.  Originally, the defendant zoning board approved the school's plans to renovate and expand.  But then, a group of neighbors protested.  *Id.* at 345–46.  After this protest emerged, the zoning board reversed its decision, concluding that the project would cause traffic and parking problems.  *Id.* at 346.  While the zoning board could have addressed the traffic and parking

---

[3]  To be sure, in *Grace United* the Tenth Circuit decided a substantial burden claim under RLUIPA.  451 F.3d at 659–60.  But *Grace United* never had to reach the degree of burden question.  *See id.* at 660.  In the trial court proceedings, the jury had found for defendant on the substantial burden claim.  *Id.* at 660.  On appeal, the religious institution merely challenged an unrelated portion of the jury instructions, *i.e.*, whether the religious institution must prove that the government substantially burdened a *fundamental* religious activity.  *Id.*  The Tenth Circuit concluded that the trial court's instruction was erroneous because RLUIPA prohibits substantial burdens against even non-fundamental religious activity—not just fundamental religious activity.  *Id.* at 663.

concerns by attaching conditions to the project's approval, it declined to do so. *Id.* The religious school filed suit, arguing, in part, that the zoning board had imposed a substantial burden on religious exercise, and thus had violated RLUIPA. *Id.* After a bench trial, the district court found for the religious school and the zoning board appealed. *Id.* at 346–47.

The Second Circuit's analysis began by explaining when a land use decision imposes a "substantial burden." The proper focus asks whether the government "directly coerce[d]" a religious institution to continue using inadequate facilities. *Id.* at 349. So, if reasonable alternatives existed for the religious institution, those alternatives signify an insubstantial burden. In such circumstances, the government's actions would not cause the religious institution to use inadequate facilities—the religious institution's refusal to exploit the reasonable alternatives would produce that outcome. *Id.* A local government can show that reasonable alternatives exist by establishing that the religious institution could reorganize its existing space, or comply with conditions attached to the project's approval and still meet its needs. *Id.* But evidence that the government's conditions are economically infeasible or disingenuous favors a finding that the government has imposed a substantial burden. *Id.* Any alternatives that would create delay, uncertainty, or expense also manifest a substantial burden.[4] *Id.*

Applying these principles, the Second Circuit held that sufficient evidence supported the district court's conclusion that the zoning board had imposed a substantial burden on the religious school. *Id.* at 352. It noted that record evidence showed the religious school could not meet its needs by reorganizing its existing space. *Id.* And the school had no reasonable

---

[4]    *Westchester* also concluded that evidence showing the government body had acted arbitrarily, capriciously, or unlawfully could establish a substantial burden. *Id.* at 350. The court believes, however, that this type of evidence "is more appropriately considered when evaluating whether a governmental action was narrowly tailored to serve a compelling state interest—an inquiry that the court should undertake only after finding that a substantial burden exists." *Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1005 (6th Cir. 2017) (citing *Westchester*, 504 F.3d at 350).

alternative that would have allowed it to teach students in adequate facilities. *Id.* Also, the Second Circuit observed, the zoning board did not approve the school's permit with conditions that would have ameliorated the zoning board's concerns. *Id.* And while zoning board officials testified at trial that they were willing to consider alternatives, the district court found their testimony not credible. *Id.*

The second instructive case is *Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548 (4th Cir. 2013). In that case, a church had purchased a tract of land in a rural area. *Id.* at 552. Shortly afterward, the county where the land was situated passed several ordinances that made it impossible for the church to build on the property it had acquired. *Id.* at 552–54. The church filed suit, alleging, among other things, a RLUIPA substantial burden claim. *Id.* at 554. The district court granted summary judgment against this claim and the church appealed. *Id.*

The Fourth Circuit reversed. It ruled that the church could establish a substantial burden by showing that it had held a reasonable expectation of building on the land when it was acquired. *Id.* at 557. Indeed, the county had allowed other churches to build within its boundaries before the church purchased the land. *Id.* at 558. Also, the summary judgment record contained sufficient evidence for a reasonable jury to conclude that the church's current building was inadequate to meet its needs. *Id.* Namely, the church adduced evidence that it had turned away potential worshippers, its facilities were overcrowded, and it could not provide enough room for certain church groups to meet in its existing facilities. *Id.* And the church's current facilities forced the church to hold three separate services, creating disunity within its congregation. *Id.* The Fourth Circuit thus concluded that a reasonable jury could have found that the county's new prohibition had imposed a substantial burden.

Together, these cases identify two requirements for plaintiffs to establish a substantial burden under § 2000cc(a)(1): (1) a need to expand or relocate; and (2) actions by defendant that inhibited their ability to expand or relocate. A religious institution can demonstrate a need to expand or relocate by showing, among other things, that it can't rearrange its existing space to accommodate its needs. *Westchester*, 504 F.3d at 345. Alternatively, a religious institution can adduce evidence that it has turned people away, its facilities are overcrowded, or the church can't form certain groups because they lack enough space. *Bethel*, 706 F.3d at 558. RLUIPA plaintiffs can show that a defendant acted to inhibit their ability to expand or relocate by showing the government actor refused to consider reasonable limits on the property's use, *Westchester*, 504 F.3d at 352, or that a plaintiff had a reasonable expectation of building there, *Bethel*, 706 F.3d at 558.

### b. Strict Scrutiny

If plaintiffs can establish a "substantial burden," then the burden of proof shifts to defendant. Defendant then must prove that its zoning decision served a compelling governmental interest and that it represented the least restrictive means to achieve that interest. 42 U.S.C. § 2000cc(a)(1). This standard is the same one used by the "strict scrutiny" test, which courts apply in other areas of constitutional law. *Yellowbear v. Lampert*, 741 F.3d 48, 59 (10th Cir. 2014).

To prove that an interest is compelling, the governmental entity must show that when it made its decision, it possessed evidence —and not mere speculation—that plaintiffs' action would harm the interest cited by the government. *Westchester*, 504 F.3d at 353. In *Westchester*, the Second Circuit affirmed the district court's finding after a bench trial that the defendant zoning board had failed to establish a compelling interest. *Id.* The district court found the

zoning board had marshaled no credible evidence that the religious school's expansion would affect public health, safety, or welfare—the compelling interest cited by the zoning board for its decision. *Id.*

When the governmental entity defends its decision by claiming that it represented the least restrictive means to achieve a compelling purpose, it must show that any alternatives suggested by plaintiffs are ineffective to achieve its goals. *Yellowbear*, 741 F.3d at 62–63. But simply asserting that plaintiffs' alternatives are ineffective will not suffice. *Id.* at 63 ("But the government's burden here isn't to *mull* the claimant's proposed alternatives, it is to *demonstrate* the claimant's alternatives are ineffective to achieve the government's stated goals." (emphasis in original)).

### 2. The Parties' Motions

With these governing legal standards in mind, the court now turns to the two cross-motions on this First Cause of Action. Exercising its discretion, the court elects to consider plaintiffs' motion first. Part a of this section addresses their motion on the substantial burden claim. In Part b, the court decides defendant's motion on that aspect of this claim.

### a. Plaintiffs' Motion

Plaintiffs' motion argues that no reasonable jury could find that defendant did not violate RLUIPA's substantial burden provision. Plaintiffs' motion does not persuade the court, at least not at the summary judgment stage.

Specifically, the facts supported in the summary judgment record could permit a reasonable jury to find that plaintiffs don't need to expand to the meeting house. One of plaintiffs' priests testified that he does not expect new groups to form if they could use the meeting house. Doc. 40-3 at 6 (Father Fongemie Dep. 39:16–20). And no groups have

complained they have had to turn away members because of space constraints.  This evidence differentiates plaintiffs' claim from the one asserted in *Bethel*.  And while some evidence suggests that noise levels in the current meeting locations are a distraction, the summary judgment record also indicates that noise presents a problem mostly on Fridays, Saturdays, and Sundays—the days when most groups meet.  In short, a reasonable jury could find that plaintiffs easily could rearrange schedules so that some of their groups meet on the weekdays.  If this view of the evidence prevailed with the jury, it reasonably could conclude that the church could solve its noise problems.

Plaintiffs argue that no reasonable jury could conclude that their religious activity is not substantially burdened because plaintiffs have a growing congregation and RLUIPA prevents governments from stunting a religious institution's growth.  Doc. 42 at 15 (citing *Mintz v. Roman Catholic Bishop of Springfield*, 424 F. Supp. 2d 309, 322 (D. Mass. 2006)).  In *Mintz*, a church asked a municipality for approval to expand its existing facility.  424 F. Supp. 2d at 311–12.  The undisputed evidence established that the church no longer could accommodate certain meetings in the existing church building.  *Id.* at 311.  A group of neighbors opposed the church's request, citing a local zoning law.  *Id.* at 313.  The municipality concluded that the zoning law violated RLUIPA's substantial burden provision and thus allowed the church to proceed with its expansion.  *Id.*  The neighbors sued to stop it, citing the zoning laws and arguing that the city had applied RLUIPA incorrectly.  *Id.*

The church moved for summary judgment against the neighbors' claim.  *Id.* at 314.  The court rejected the neighbors' position and granted the church's summary judgment motion.  *Id.* at 317.  The neighbors argued that refusing to allow the expansion would not constitute a substantial burden because the church's facilities had sufficed for nearly 90 years.  *Id.*  But the

court concluded that simply because the church's facilities once were adequate does not mean a city never can violate RLUIPA's substantial burden provision. *Id.* at 322. Indeed, the undisputed evidence in *Mintz* established that the church had outgrown its facilities, so rigidly enforcing the municipality's zoning law would have imposed a substantial burden on the church. *Id.*

But the admissible evidence here—at least when viewed in the light most favorable to defendant—is different. The summary judgment facts establish that plaintiffs have not outgrown its current facilities. And while future growth may change plaintiffs' situation, RLUIPA only protects religious institutions that currently have inadequate facilities. *See Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 738 (6th Cir. 2007) ("The question before us here is whether the Township's denial substantially burdens [the church's] religious exercise *now* . . . ." (emphasis original)).

Finally, a reasonable jury also could find that plaintiffs lacked a reasonable expectation of using the meeting house, and thus, defendant did not inhibit plaintiffs' ability to expand to that structure. Unlike *Bethel*, nothing suggests that another church—or even another secular organization—has used a single-family house as a public use.

The court denies plaintiffs' motion for summary judgment on their substantial burden claim.

### b. Defendant's Motion

Turning now to defendant's motion on the substantial burden claim, defendant makes two arguments. It contends that no reasonable jury could find that plaintiffs' religious exercise is substantially burdened. Defendant also argues that even if a reasonable jury could find a

substantial burden, it could not find defendant failed the strict scrutiny standard. The court concludes otherwise.

First, a reasonable jury could find that defendant has imposed a substantial burden on plaintiffs' religious exercise. The summary judgment record contains admissible evidence that plaintiffs cancel group meetings five to six times a year because they lack adequate space when the church hosts bake sales, fundraisers, and dinners. Also, the summary judgment record— when viewed in plaintiffs' favor—contains evidence that when multiple groups meet in the basement, the noise levels make it impossible for participants to conduct meaningful discussions.[5] And while a reasonable jury also might find that one alternative available to plaintiffs—rescheduling some meetings for the weekdays—provides a reasonable solution to this problem, a reasonable jury might conclude differently. Specifically, plaintiffs have adduced admissible evidence that this putative solution is unreasonable because the members of some groups might have difficulty meeting on those alternative days.

Likewise, a reasonable jury could find that defendant prevented plaintiffs from expanding their religious services. Notably, much like *Westchester*, defendant could have chosen to approve plaintiffs' application but attached certain conditions to its approval. But it didn't. While the summary judgment record contains evidence that defendant floated the idea of hour

---

[5]    Defendant argues that distractions cannot constitute a substantial burden as a matter of law, citing *Williams Island Synagogue, Inc. v. City of Aventura*, 358 F. Supp. 2d 1207, 1215 (S.D. Fla. 2005). Doc. 46 at 43–44. But in that case, the religious organization argued the city's denial of a permit to build a larger synagogue constituted a substantial burden because (1) women who arrive late at its current facility caused distractions in the men's prayer area, (2) the current synagogue required religious meals to be prepared in the prayer area, and (3) the current synagogue's orientation forced members to turn their bodies away from the front of the synagogue to face Jerusalem. *Williams*, 358 F. Supp. 2d at 1215. The district court concluded that no reasonable jury could conclude that these burdens were substantial because they were simply nuisances and minor distractions. *Id.* at 1215–16.

In contrast, here the summary judgment record paints a different picture. The distractions in this case do not consist of group members arriving late, or involve the distraction of preparing religious meals elsewhere. Instead, the distraction is the noise generated during Fridays, Saturdays, and Sundays, making it difficult to conduct meetings at all. A reasonable jury could find that this noise is more than a simple nuisance or minor distraction.

limitations and capacity restrictions, defendant never formulated any specific restrictions for plaintiffs to consider. So, a reasonable jury could conclude that defendant's reference to conditions was disingenuous or unreasonable. *See Westchester*, 504 F.3d at 349 ("Of course, a conditional denial may represent a substantial burden if the condition itself is a burden on free exercise, the required modifications are economically unfeasible, or where a zoning board's stated willingness to consider a modified plan is disingenuous.")

The court's conclusion about substantial burden doesn't end the analysis. Defendant also could deserve summary judgment if the summary judgment facts establish that defendant's decision represented the least restrictive means to satisfy a compelling governmental interest. The court thus continues its analysis, evaluating the strict scrutiny component of defendant's motion.

Defendant argues that its decision served compelling interests because it maintained the aesthetics of the residential neighborhood, prevented traffic from clogging a residential cul-de-sac—51st Street—and reduced noise. Generally speaking, case law recognizes that a governmental entity's interest in controlling traffic and reducing noise are compelling interests under RLUIPA. *Murphy v. Zoning Comm'n of Town of New Milford*, 148 F. Supp. 2d 173, 190 (D. Conn. 2001) ("There appears to be no dispute that local governments have a compelling interest in protecting the health and safety of their communities through the enforcement of the local zoning regulations."); *see also Vill. of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 394–95 (1926) ("[Commentators opining about the benefits of zoning laws] concur in the view that the segregation of residential, business, and industrial buildings will make it easier to provide fire apparatus suitable for the character and intensity of the development in each section; that [zoning laws] will increase the safety and security of home life, greatly tend to prevent street

accidents, especially to children, by reducing traffic and resulting confusion in residential sections, decrease noise and other conditions which produce or intensify nervous disorders, preserve a more favorable environment in which to rear children, etc."). *But see Rocky Mountain Christian Church v. Bd. of Cty. Comm'rs of Boulder Cty.*, 612 F. Supp. 2d 1163, 1175 (D. Colo. 2009) (holding, under RLUIPA, that traffic safety is not a compelling governmental interest that can justify imposing a substantial burden on a religious institution).

That traffic and safety concerns can qualify as a compelling governmental interest does not entitle local governments to summary judgment in every RLUIPA case where they invoke those reasons. For instance, the Second Circuit held in *Westchester* that the zoning board had failed to establish a compelling interest despite asserting traffic concerns as its compelling interest. 504 F.3d at 353. Critical to this holding, the court concluded that the defendant zoning board had failed to marshal any evidence supporting the concerns it articulated. *Id.*

Here, the summary judgment facts—viewed in the light most favorable to plaintiffs— show a similar situation. At meetings defendant held to discuss plaintiffs' proposal, multiple residents asserted that more cars would park on the cul-de-sac if plaintiffs used the meeting house as they proposed. But admissible evidence shows that plaintiffs assured defendant that they would prevent that from happening. Plaintiffs informed defendant they would require parishioners to park in the church's parking lot—located next to the meeting house—or at another parking venue available to plaintiffs. Plaintiffs' assurances could permit a reasonable jury to find that defendant's fears about traffic on the 51st Street cul-de-sac were unsupported. And defendant based its fears about the meeting house's noise level on the assumption that plaintiffs would allow as many people into the meeting house as it could hold, and at all hours of the day. A reasonable jury could conclude that this assumption was unwarranted because

admissible evidence showed that: (a) plaintiffs represented that not more than 25 people would use the meeting house at any given time; and (b) nothing suggested that plaintiffs would use the house at all hours of the night.

And even if the summary judgment facts showed defendant had established a compelling interest, a reasonable jury still could find for plaintiffs on this claim. The governing law also requires defendant to establish that its zoning decision represented the least restrictive means to serve its goals—here, reducing noise and traffic. 42 U.S.C. § 2000cc(a)(1)(B). In their meetings with defendant, plaintiffs suggested defendant could address these noise and traffic concerns simply by enforcing its noise and parking ordinances. Cory Fisher—a member of defendant's City Plan Commission—testified that defendant did not believe this sufficed because, historically, the police have not responded to noise violations. Doc. 40-2 at 15 (Fisher Dep. 79:13–80:3). Defendant also produced evidence that it does not restrict parking on 51st Street.

A reasonable jury could conclude that these explanations don't establish that alternatives were inadequate. *See Yellowbear*, 741 F.3d at 62–63 ("As part of its burden to show that its policy represents the least restrictive means available to further its putatively compelling interest, the government must of course 'refute alternative schemes' suggested by the plaintiff to achieve that same interest and show why they are inadequate.") (quoting *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011)). As plaintiffs point out, a jury appropriately might find defendant could amend its parking ordinance to ban parking on 51st Street—or, at the very least, restrict parking to the 51st Street residents and their guests. And defendant could choose to require its police officers to begin enforcing the noise ordinance's restrictions. In short, a reasonable jury could find solutions would allow plaintiffs to use the meeting house while still protecting defendant's interest in minimizing noise and traffic issues on the cul-de-sac.

In sum, defendant has failed to carry its summary judgment burden.

**B.      Equal Terms (Second Cause of Action)**

Both parties also move for summary judgment on the claim asserted by the Complaint's Second Cause of Action.  In that claim, plaintiffs allege that defendant treated their land-use request on less than equal terms than defendant treated requests by two similarly situated secular entities—Pembroke Hill and UKHA.  In general terms, RLUIPA forbids governments, when implementing a land use regulation, from treating religious institutions on less than equal terms than secular entities.  42 U.S.C. § 2000cc(b)(1).  To prove a claim under this provision, plaintiffs first must identify a similarly situated secular entity and then show that defendant treated the secular entity in a preferential fashion.  *Rocky Mountain Christian Church v. Bd. of Cty. Comm'rs*, 613 F.3d 1229, 1236 (10th Cir. 2010).  Here, the parties all agree—for purposes of summary judgment—that:  (1) defendant treated Pembroke Hill and UKHA more favorably because defendant approved their applications but denied plaintiffs' and; (2) those two entities are secular entities.  So, the dispositive issue for the equal terms claim is whether Pembroke Hill and UKHA are similarly situated to plaintiffs.

The court addresses this aspect of the motion by, first, describing how courts evaluate whether two entities are similarly situated.  It then addresses the parties' motions together, first analyzing whether Pembroke Hill is similarly situated and then addressing UKHA.

**1.   Governing Law**

Whether two entities are similarly situated under RLUIPA is a fact-specific question that the jury normally should decide.  613 F.3d at 1236.  In *Rocky Mountain*, as an example, a church sought approval to expand its building from the county government.  *Id.* at 1234.  The county denied the request.  *Id.* at 1235.  But earlier, the county had approved a secular school's

application to expand.  *Id.* at 1236.  The church sued, alleging the county had treated the church

on less than equal terms as a secular school.  *Id.*  At trial, a jury found for the church.  *Id.*  The

county appealed, arguing that insufficient evidence supported the jury's verdict.  *Id.*  More to the

point, the county argued that the two projects were different because the school's expansion was

half the size of the church's, the school proposed to expand via multiple buildings instead of the

one large structure proposed by the church, and the traffic from the expanded church would

dwarf the traffic produced by the school's expansion.  *Id.*

The Tenth Circuit acknowledged these differences, but found ample evidence of

similarities between the two projects.  *Id.*  It thus affirmed the jury's verdict for the church.  *Id.*

Specifically, the Circuit noted, the church had presented evidence that:  (1) the two facilities,

when completed, would have a similar square footage; (2) neither expansion would change the

building's usage; (3) each project would expand the existing buildings capacity by around 100

students; and (4) both properties were situated in the same zoning district.  *Id.* at 1236–37.  So,

"[a]lthough the two proposed expansions were not identical, the many substantial similarities

allow for a reasonable jury to conclude that [the church] and [the school] were similarly

situated."  *Id.* at 1237.[6]

In contrast, a governmental defendant can show that two projects are dissimilar by

showing that different zoning criteria apply.  *Chabad Lubavitch of Litchfield Cty., Inc. v.*

*Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 197 (2d Cir. 2014).  In *Chabad*, a synagogue

---

[6]        *Rocky Mountain* notes a circuit split on the question whether RLUIPA's equal terms provision is subject to
an affirmative defense.  *Id.*  Some circuits hold that, even if a religious institution proves that a government has
treated a similarly situated secular entity on better terms than a religious one, the government can avoid liability if it
can survive the strict scrutiny analysis.  *Id.* (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1232
(11th Cir. 2004)).  In contrast, other circuits hold that no affirmative defense exists under RLUIPA's equal terms
provision.  *Id.* (citing *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 269 (3d Cir.
2007)).  The Tenth Circuit explicitly declined to decide this issue in *Rocky Mountain*.  *Id.* at 1238.  Here, neither
party raised this issue, so the court declines to address it.

asked a historic building board for permission to expand the synagogue's current building—a historic structure. *Id.* at 189. The historic building board denied the synagogue's request, explaining the expansion would not preserve the character of the surrounding historic district and would overwhelm the neighborhood. *Id.* at 190. The synagogue sued, arguing, in part, that the historic building board treated it on less than equal terms than it had applied to a secular library. *Id.* at 197. The library, located in the same historic district, successfully had applied to expand. *Id.*

The district court granted summary judgment against this claim. The synagogue appealed. *Id.* The Second Circuit concluded that no reasonable jury could find the library was a similarly situated secular entity. *Id.* It observed that when the library asked to expand, a different decisionmaker—not the historic building board—approved the library's expansion. *Id.* And different criteria guided that decision maker. *Id.* Specifically, the law in place when the library had expanded *prohibited* the former decisionmaker from considering the relative size of the proposed expansion. *Id.* In contrast, when the synagogue applied to expand, the law then in effect *required* the historic building board to consider the size of the expansion. *Id.* And though *Chabad* recognized that "minor differences in land use regimes may not defeat a comparison under the equal terms provision [of RLUIPA], the library and the synagogue were not similarly situated because the size of the synagogue's expansion was central to the historic board's decision." *Id.*

Likewise, entities who are exempt from local zoning requirements are not similarly situated to religious entities who are not. In *Signs for Jesus v. Town of Pembroke, N.H.*, 230 F. Supp. 3d 49 (D.N.H. 2017), a city allowed a public school to operate an electronic sign outside its building. *Id.* at 55. But the city denied a church the same opportunity, citing a zoning law

banning electronic signs.  *Id.*  The church sued, arguing that the city had violated RLUIPA's equal terms provision.  *Id.* at 56.  The city moved for summary judgment and the district court granted its motion, concluding that no reasonable jury could find that the school and the church were similarly situated.  *Id.* at 63.  The court explained that the school was a subdivision of the state and, under state law, municipalities cannot impose regulations against a state subdivision— including its zoning laws.  *Id.* at 64.  In short, different laws governed the church's use and the school's use of electronic signs.  *Id.*  This difference, *Signs for Jesus* held, made the two entities differently situated as a matter of law.  *Id.*

### 2.  The Equal Terms Theories Asserted Here

Plaintiffs in the current case base their equal terms claim on defendant's treatment of two secular institutions:  the Pembroke Hill School and the University of Kansas Hospital Authority. Given the fact specific inquiry required by the equal terms analysis, the court discusses these two comparators, separately and in detail, in the next two subsections.

### a.  Pembroke Hill School

The first secular institution invoked by plaintiffs' equal terms claim is Pembroke Hill School—a secular, private school with some operations inside defendant's city limits.  Plaintiffs specifically emphasize three times when Pembroke Hill asked defendant for a permit and defendant granted it:  (i) in 1999, when Pembroke Hill asked to use a newly acquired field in the Residential District as a public use; (ii) in 2006, when Pembroke Hill asked to rezone its property in that district and build a tennis court on it; and (iii) in 2012, when Pembroke Hill asked to expand its use of those athletic fields.  The court discusses each project, in turn.

### i. 1999

Plaintiffs argue that a reasonable jury could reach just one conclusion:  that plaintiffs' application to use its house as a meeting house similarly situates it to Pembroke Hill's 1999 request.  Plaintiffs note that both projects were governed by the same zoning ordinances and situated in the same zoning district.  And, plaintiffs argue, both projects were designed to cause large groups of people to congregate in the evenings and weekends near residential properties.  Defendant reaches the opposite conclusion.  It asserts that no reasonable jury could find that plaintiffs and Pembroke Hill are similarly situated.  Defendant notes that Pembroke Hill agreed to restrict usage of its field while plaintiffs refused to do so.  Defendant also notes that one can access Pembroke Hill's fields only from State Line Road—not a cul-de-sac.

Neither sides' argument can carry the day at summary judgment.  Evidence in the summary judgment record would permit a reasonable jury to conclude the similarities in zoning laws and usage between the two projects made Pembroke Hill's 1999 project like plaintiffs' proposed project—just as the jury found in *Rocky Mountain*.  But other record evidence will permit an equally reasonable jury to conclude that the projects are dissimilar.  The school's fields cannot be accessed via a cul-de-sac, and they present no noise or hours of operations concerns.  Those factors were important ones in defendant's decision to deny plaintiffs' permit.  Doc. 40-19 at 4–5.  *See also Chabad*, 768 F.3d at 197 (explaining that differences between projects that were central to the government's decision constitute evidence that two entities are not similarly situated).

### ii. 2006

Pembroke Hill next asked to expand in 2006, when it sought to build tennis courts on its property in the newly created Planned Recreation District.  Plaintiffs argue that their application

is similarly situated to Pembroke Hill's 2006 request because the tennis courts and the meeting house are located near residential homes. And, they note, though the two tracts are located in different zoning districts—the tennis courts are in the Planned Recreation District and the meeting house is in the Residential District—the character of the districts is similar. In the Residential District, defendant allows public uses such as swimming pools and parks. A reasonable jury could find, plaintiffs say, those uses are similar to the types of activities it allows in the Recreation District: amateur athletic fields, tennis courts, and running trails. Plaintiffs also emphasize that defendant used the same criteria to evaluate the two projects. Indeed, the same words define the standard used to evaluate projects in the Planned Recreation District and public uses in defendant's Residential District.

In contrast, defendant argues that differences between the two projects could lead a reasonable jury to just one conclusion: Pembroke Hill's project and plaintiffs' use are not similarly situated. Defendant asserts that the tennis courts can't be used at night because they are not lighted—unlike the meeting house. Also, the only way to access the tennis courts is from State Line Road. Finally, defendant argues that even though the criteria used to evaluate planned uses in the Planned Recreation District and public uses in the Residential District employ the same language, the context in which the criteria are evaluated differs. Doc. 50 at 15–16. Indeed, one of the criteria for both districts requires defendant to conclude that the use "is compatible with the general character *of the district*." Doc. 47-6 at 213, 240 (Defendant City Code § 12-402(b)(2), -405(b)(2) (emphasis added)). What "is compatible with the general character" of the Planned Recreation District, defendant argues, is different than what "is compatible with the general character" of the Residential District because one should expect different types of noises and activity in each.

Again, the similarities and differences between the two projects could permit a reasonable jury to side with either party. A reasonable jury could find the differences in character between the Residential and Planned Recreation Districts constitute "minor differences" that "may not defeat a comparison under the equal terms provision . . . ." *Chabad*, 768 F.3d at 197. And a reasonable jury easily could find that the similarities of the two projects—*i.e.*, that both involve projects that will cause large groups of people to congregate near residential homes—make them similarly situated.

On the other hand, a reasonable jury could see the differences between the projects as too great to establish an equal terms violation. The school's inability to use the tennis courts at night and different access points might convince the jury that substantial differences exist because traffic on the residential street and noise at night were important considerations to defendant's decision to reject plaintiffs' project. *See Chabad*, 768 F.3d at 197. In short, both parties have adduced enough evidence to survive summary judgment. The court denies their motions on this basis.

### iii.  2012

This leaves the parties' arguments addressing the meeting house and Pembroke Hill's 2012 request to expand its soccer field and install permanent restrooms. This set of arguments is identical to the ones based on Pembroke Hill's 2006 project. Plaintiffs reiterate that the Planned Recreation District—where the soccer fields and restrooms are located—and Residential District have the same approval criteria and that both projects will create areas where large groups of people will congregate on evenings and weekends near residential housing. And defendant repeats its argument that the two zoning districts serve materially different purposes, Pembroke Hill's fields operate under hours and noise limitations, and the fields only can be accessed from

State Line Road.  As it did with the 2006 comparison, the court concludes that these differences and similarities will not permit summary judgment for either party.

### b.  UKHA

In contrast to the Pembroke Hill projects, UKHA is not similarly situated as a matter of law.  In 2014, UKHA built a parking lot for its employees who work in a clinic across the street to use.  Whether the court views the evidence in plaintiffs' or defendant's favor, UKHA is not a similarly situated entity.

First, UKHA occupies a materially different zoning district—the Office District—than the one where plaintiffs wish to build.  And this parking lot is used on workdays.  Plaintiffs plan to use the meeting house in the evenings and on the weekends—when defendant's residents are at home.  Also, the entrance to UKHA's parking lot is off of Rainbow Boulevard—a major thoroughfare—and not 51st Street, the residential cul-de-sac where the meeting house is situated. These two differences matter because defendant justified its adverse decision on plaintiffs' application by citing concerns about noise while families were home and traffic on a residential cul-de-sac.  *See Chabad*, 768 F.3d at 197 (granting summary judgment against an equal terms claim because the identified differences between the secular project and the religious project were central to defendant's differing decisions).

Also, Kansas law does not require UKHA to secure a permit before engaging in a construction project.[7]  *See* Kan. Stat. Ann. § 76-7,130(a) (providing that a municipality cannot require a research or development facility for a state educational institution to secure a permit for

---

[7]       Plaintiffs argue that this fact is not a difference because RLUIPA provides them with a legal right to have defendant approve their application.  Doc. 47 at 16.  This position overstates RLUIPA.  RLUIPA does not exempt religious organizations from securing land use permits.  *See* 146 Cong. Rec. S7776 (daily ed. July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy) ("[RLUIPA] does not provide religious institutions with immunity from land use regulations, nor does it relieve religious institutions from applying for variances, special permits or exceptions, hardship approval, or other relief provisions in land use regulations, where available without discrimination or unfair delay.").  This argument is unpersuasive.

a construction project); *see also Signs for Jesus*, 230 F. Supp. 3d at 64 (holding that no reasonable jury could conclude that a school and religious institution were similarly situated because the school was exempt from the zoning law that prevented the religious institution from building). These differences—whether viewed in the light most favorable to plaintiffs or defendant—establish that UKHA and plaintiffs are not a similarly situated as a matter of law.

Plaintiffs persist, however, arguing that a reasonable jury only could conclude that UKHA is a similarly situated entity. They note that defendant discounted a traffic study they procured about the effect of the meeting house, even though defendant had accredited a similar study produced by the same firm and used by UKHA to establish the traffic effects of its parking lot. Doc. 42 at 18. But having the same consulting firm perform a traffic study is insufficient to nullify the organic factual differences between the two projects. The author of the traffic study was not central to defendant's decision. Instead, concerns about traffic and noise during evenings and on weekends along a residential cul-de-sac were the operative concerns. And Kansas law provides UKHA with immunity from securing local zoning permits. These differences—as a matter of law—entitle defendant to summary judgment against plaintiffs' reliance on UKHA as a similarly situated comparator. The court grants summary judgment against the portion of the Second Cause of Action that relies on UKHA's project.

### C.     Unreasonable Limits (Fourth Cause of Action)

Defendant—but not plaintiffs—moves for summary judgment against the claim asserted in the Complaint's Fourth Cause of Action. This claim asserts a violation of RLUIPA's unreasonable limits provision.

This part of RLUIPA bars laws that completely exclude or unreasonably limit all religious assemblies, and government practices that effectively bar all religious activity. *Rocky*

*Mountain*, 613 F.3d at 1238.  To succeed on a claim under this portion of RLUIPA, a plaintiff must show something in addition to showing that a municipality completely excluded the plaintiff's religious assembly or imposed limitations that effectively bar plaintiff's religious activity.  Instead, the plaintiff must establish that the defendant-municipality completely excluded *all* religious assembly or imposed limitations that effectively bar *all* religious activity. *Id.*; *see also Muslim Cmty. Ass'n of Ann Arbor & Vicinity v. Pittsfield Charter Twp.*, 947 F. Supp. 2d 752, 769 (E.D. Mich. 2013) (dismissing a RLUIPA unreasonable limits claim but allowing a substantial burden claim to survive).

In *Rocky Mountain*, the Tenth Circuit held that a church had adduced sufficient evidence to support a jury's verdict for the church on its unreasonable limits claim.  613 F.3d at 1239.  The church's expert testified that the county government's land use regulations made it more difficult, in general, for churches to operate in the county.  *Id.* at 1238.  Another witness testified that a county government official had said that the county government would not allow any religious assembly with a capacity of more than 100 members to build within its borders.  *Id.* Also, the plaintiff church presented evidence that earlier, another church had exhausted its funds trying to secure a permit to build a church.  *Id.*  Finally, the church presented evidence that the government had acted discriminatorily against it by:  (1) refusing to approve the church's application after it tried to appease the county government; and (2) altering a report to embellish the magnitude of the church's proposed expansion.  *Id.*

Here, plaintiffs have adduced insufficient evidence for a reasonable jury to conclude that defendant places unreasonable limits on all religious practices within its boundaries.  Notably, the permitting process does not involve the same onerous twists and turns presented in *Rocky Mountain*.  Indeed, no admissible evidence suggests that plaintiffs or any other religious

organization ran out of money trying to secure a permit from defendant.  Nor does the summary judgment record contain evidence that plaintiffs attempted to address defendant's concerns, but defendant continued to deny their modified application.  The court is mindful that the summary judgment record contains evidence that defendant exaggerated the meeting house's proposed use.  But no evidence suggests that defendant imposed unreasonable limits on any other religious organization.  The limited reach of plaintiffs' evidence prevents a reasonable jury from finding in plaintiffs' favor on this Fourth Cause of Action.  The court thus grants defendant's motion for summary judgment against this claim.

### D.      § 1983 (Fifth Cause of Action)

Defendant argues that it is entitled to summary judgment against the § 1983 claim asserted in plaintiffs' Fifth Cause of Action.  Under § 1983, no person,[8] under color of state law, can deprive another of a constitutional right.  Defendant argues that the summary judgment record contains insufficient evidence for a reasonable jury to find that defendant violated plaintiffs' constitutional rights.  Plaintiffs—who did not move for summary judgment on this claim—argue that a reasonable jury could find that defendant violated plaintiffs' First Amendment right to exercise their religion freely.

The First Amendment broadly prohibits governments from banning religious thoughts or beliefs.  It allows, however, laws that regulate religious practices in some circumstances.  *Grace United*, 451 F.3d at 649.  Generally, under the First Amendment, laws that are not discriminatory on their face and evenly applied are permissible so long as they are rationally related to a legitimate governmental purpose.  *Id.*  At first glance, this rule would seem to apply to plaintiffs' challenge of defendant's zoning ordinances because the ordinances do not treat religious

---

[8]        "Person," as used in this provision, includes municipalities.  *Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978).

institutions differently.  But plaintiffs argue that defendant did not apply its zoning ordinances evenly to religious and secular institutions.  This discriminatory treatment, plaintiffs argue, requires a strict scrutiny analysis, citing *Grace United* for support.

In *Grace United*, a church had applied to secure a license allowing it to operate a 100-child daycare center in a low-density residential zone.  *Id.* at 647.  The city denied the license, citing a local zoning ordinance that prohibited daycare centers that care for more than 12 children in low-density residential zones.  *Id.* at 648.  The church sued, alleging, in part, that the city had violated its Free Exercise rights by refusing to grant the license.  *Id.*  The district court granted summary judgment against the Free Exercise claim and the church appealed.  *Id.*

On appeal, the church argued that even though the city's zoning ordinance did not discriminate against religious institutions on its face, the city had applied its ordinance discriminatorily.  *Id.* at 650.  The Tenth Circuit agreed with the premise of the church's argument.[9]  *Id.* at 653.  It held that, if the church could adduce evidence of discriminatory treatment, the city could escape liability only by surviving a strict scrutiny analysis.  *Id.* at 653. The Circuit then outlined five factors for courts to consider when determining whether a government has applied a neutral law discriminatorily:

1) Whether defendant passed its zoning ordinances because of religious animus.  *Id.*

2) Whether defendant has targeted religious groups specifically in its enforcement of the law.  *Id.*

3) Whether defendant has treated similarly situated secular institutions more favorably than plaintiffs.  *Id.*

---

[9]      The Circuit concluded, however, that the church had failed to adduce any evidence that the city applied its ordinance discriminatorily.  *Grace United*, 451 F.3d at 653.

4) Whether the zoning ordinance's exceptions are based on broad, objectively defined criteria or, instead, on subjective considerations. *Id.*

5) Whether the law places a substantial burden on plaintiffs' religious exercise. *Id.*

On this case's summary judgment record, a reasonable jury could conclude that the last three factors favor a finding that defendant did not apply its zoning laws evenly.

A reasonable jury could conclude that the third factor favors a finding that defendant applied its facially neutral laws discriminatorily. The record contains evidence that defendant treated Pembroke Hill—a secular institution—more favorably than it treated plaintiffs. As explained above, a reasonable jury could find that Pembroke Hill and plaintiffs are similarly situated and that defendant treated the secular school more favorably. *See supra*, Part IV.B.2.a.

The summary judgment record also permits a finding that that the criteria which defendant uses to approve public uses in the Residential District are subjective—the fourth factor in *Grace United*. Defendant must make some subjective decisions, such as the proposed use "is compatible with the general character of the [zoning] district," and "does not jeopardize the public health, safety or welfare." Doc. 47-6 at 213 (Defendant City Code § 12-402(b)(2), (3)). These conclusions are nothing like the objective, fact-based criteria considered in *Grace United*. The ordinance in *Grace United* allowed daycare centers in low-density residential zones but only if they served 12 children or fewer. 451 F.3d at 653. While the other findings defendant must make are based on objective criteria, *i.e.*, the requirement of a screening fence and percentage of open space to total space, *see* Doc. 47-6 at 213 (Defendant City Code § 12-402(b)(6), (7)), a reasonable jury could conclude defendant's decision is governed by sufficiently subjective considerations for this fourth factor to favor plaintiffs.

Finally, the summary judgment record also provides a basis for a reasonable jury to conclude that defendant imposed a burden on plaintiffs' religious activities. In *Grace United*, the Circuit explained that while a church has no constitutional right to build its facilities in the most ideal location, operating in an overcrowded facility may constitute a burden on plaintiffs' religious activities. *Id.* at 655. And a religious institution can establish uneven application of zoning laws by showing that the government's decision or law has placed a burden on it. *Id.* As already explained above, a reasonable jury could conclude that plaintiffs' current facility is too small and overcrowded to accommodate plaintiffs' groups effectively. *See supra*, Part IV.A.2.b. So, a reasonable jury could find that this fifth factor also favors plaintiffs.

In contrast, the summary judgment record contains no evidence favoring plaintiffs on the first and second of *Grace United*'s factors. Namely, plaintiffs have adduced no evidence that religious animus inspired defendant's zoning provisions. Nor do plaintiffs adduce evidence that defendant targets religious institutions.

Because three of the five factors favor a finding that defendant enforced its facially neutral law discriminatorily, the court must apply the strict scrutiny analysis. As explained above, a reasonable jury could conclude from this summary judgment record that defendant's actions fail the strict scrutiny standard. *See supra*, Part IV.A.2.b. The court thus denies defendant's motion as it pertains to the Fifth Cause of Action.[10]

---

[10]     *Grace United* does not specify how many of the five factors are required for strict scrutiny to apply. Some courts have interpreted *Grace United* to mean that if a government makes subjective value judgments to grant exemptions from a general rule, then a government must justify its actions under strict scrutiny. *See Mount St. Scholastica, Inc. v. City of Atchison, Kan.*, 482 F. Supp. 2d 1281, 1294 (D. Kan. 2007) (holding that city-defendant must justify its actions under the strict scrutiny analysis because it denied an exemption to a church after making a subjective value judgment). In other words, these courts apply strict scrutiny if a religious institution meets the fourth factor from *Grace United*.

    Other courts impose strict scrutiny analysis only when a government makes subjective value judgments and the plaintiff produces evidence that the government has favored secular institutions when making those value judgments. *See Grace Church of Roaring Fork Valley v. Bd. of Cty. Comm'rs of Pitkin Cty., Colo.*, 742 F. Supp. 2d

### E. Section 7 of the Kansas Constitution's Bill of Rights (Sixth Cause of Action)[11]

The Complaint's Sixth Cause of Action invokes § 7 of the Kansas Constitution's Bill of Rights. This portion of the Kansas Bill of Rights provides, "The right to worship God according to the dictates of conscience shall never be infringed . . . ." Kan. Const. Bill of Rights § 7. This protection includes the right to exercise one's religion freely, much like the protection recognized by the First Amendment to the Constitution of the United States. *State v. Smith*, 127 P.2d 518, 523 (Kan. 1942). But Kansas state courts have held that § 7's protections are broader than those of the First Amendment to the federal Constitution. *Stinemetz v. Kan. Health Policy Auth.*, 252 P.3d 141, 157 (Kan. Ct. App. 2011). For example, any law that burdens a religious practice—even if the law is facially neutral and generally applied—triggers strict scrutiny under § 7. *Id.* at 160.

So, when analyzing a § 7 claim, Kansas courts use a four-part test. *Id.* The first two parts ask: "(1) whether [plaintiffs'] belief is sincerely held; [and] (2) whether the state action burdens[12] the exercise of religious beliefs . . . ." *Id.* (internal quotation and citation omitted).

---

1156, 1166–67 (D. Colo. 2010) ("A First Amendment violation can be established by evidence showing that a governmental entity has exercised value judgments in favor of secular motivations but not religious motivations . . . ."). On defendant's Motion for Summary Judgment, plaintiffs have adduced enough evidence for a reasonable jury to find in their favor no matter which test the court applies. Still, the court alerts the parties to this issue and urges them to address the question fully when they submit their proposed jury instructions.

[11]     The court has jurisdiction over plaintiffs' federal claims. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). A related provision, 28 U.S.C. § 1367, provides: "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *See also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966) (holding that a district court has "[p]endent jurisdiction" over state law claims in a case where subject matter jurisdiction exists over the federal claim and the "state and federal claims . . . derive from a common nucleus of operative fact"). Here, plaintiffs' state law claims—the Complaint's Sixth and Seventh Causes of Action—revolve around the same set of operative facts as their federal claims: defendant's decision to deny their application to designate the proposed meeting house as a public use. This means that § 1367 confers jurisdiction over plaintiffs' Kansas law claims.

[12]     Defendant's motion argues that only state action that "heavily" burdens a religious exercise can trigger § 7's protection. Doc. 50 at 24. It cites a passage in *Stinemetz* where the Kansas Court of Appeals opined,

Plaintiffs have the burden of proving both prongs. *Id.* If plaintiffs carry their burden to establish (1) and (2), the burden shifts to defendant to prove that "the state interest is overriding or compelling; and [if so] . . . the state uses the least restrictive means" to accomplish that interest.[13] *Id.* (internal quotation and citation omitted).

Here, a reasonable jury could conclude that plaintiffs' beliefs are sincerely held. Plaintiffs assert that the gatherings they would hold in the meeting house—such as prayer groups and Bible studies—are important facets of their religion. And a reasonable jury could conclude that defendant burdened plaintiffs' ability to hold these gatherings by refusing to allow them to use their property as a meeting house. *See supra*, Part IV.A.2.b.

Having concluded that plaintiffs have met their summary judgment burden on this two-part test, the analysis shifts to defendant's burden. The court concludes that a reasonable jury also could find that defendant has failed to meet its burden to justify its actions under the strict scrutiny standard apply. When evaluating whether a government's decision survives strict scrutiny, Kansas courts apply the same standard as the federal courts. *Stinemetz*, 252 P.3d at 160–61. As explained above, a reasonable jury could conclude that defendant fails to establish a compelling interest. *See supra* Part IV.A.2.b. And a reasonable jury also could conclude that less restrictive alternatives existed to achieve defendant's interests. *See id.* Thus, defendant has

---

"Conditioning the provision of a life-saving public benefit on [plaintiff] agreeing to engage in conduct which violates her deeply held religious beliefs constitutes a *heavy* burden on her free exercise of religion." 252 P.3d at 160 (emphasis added). But this passage simply describes the burden that the actions of the *Stinemetz* defendant imposed on plaintiff. The Kansas Court of Appeals never used the phrase "heavy burden" in any other aspect of its opinion. So, based on the words actually used in *Stinemetz*, the court holds that plaintiffs, to carry this aspect of its burden, need only show a burden on their religious practices.

[13]     Defendant argues that no Kansas precedent establishes that this test applies to land use regulations. Doc. 50 at 24. But defendant cites no case authority to support its position; and indeed, the court's own research reveals no case applying *Stinemetz* to a land use case. But nothing in *Stinemetz*'s holding or reasoning will support the belief that Kansas courts would not apply *Stinemetz* to a land use case.

failed to sustain its summary judgment burden and so, the court denies defendant's motion against plaintiffs' Sixth Cause of Action.

### F.     Kansas Preservation of Religious Freedom Act (Seventh Cause of Action)

The Kansas Preservation of Religious Freedom Act ("KPRFA") prohibits a governmental entity from substantially burdening a person's right to exercise religion unless the government proves, by clear and convincing evidence, that its action furthers a compelling governmental interest and its action is the least restrictive way to accomplish that interest. Kan. Stat. Ann. § 60-5303(a). No court—state or federal—has applied the KPRFA yet. But other states have evaluated similar state religious freedom statutes under the same framework applied to RLUIPA substantial burden claims. *See, e.g.*, *Maum Meditation House of Truth v. Lake Cty., Ill.*, 55 F. Supp. 3d 1081, 1088 (N.D. Ill. 2014) (interpreting the Illinois Religious Freedom Restoration Act—which contains practically identical language as the KPFRA—in the same way as RLUIPA's substantial burden provision). With no Kansas guidance to the contrary, the court follows *Maum*'s lead and applies that same standard to the Kansas statute.

As explained above, a reasonable jury could conclude that defendant violated RLUIPA's substantial burden provision. *See supra*, Part IV.A.2.b. The court reaches the same conclusions about plaintiffs' KPFRA claim and thus denies defendant's motion for summary judgment against the Seventh Cause of Action.

## V.     Conclusion

In summary, the court grants defendant's Motion for Summary Judgment (Doc. 39) in part and denies it in part. And the court denies plaintiffs' Motion for Summary Judgment (Doc. 41). More specifically, the court concludes that it cannot grant summary judgment to plaintiffs or defendant on the claims asserted by the First, Fifth, Sixth, and Seventh Causes of Action. But

the court grants summary judgment against plaintiffs on their Fourth Cause of Action. Also, the court grants defendant's summary judgment motion against the Second Cause of Action to the extent that claim relies on UKHA as a similarly situated secular entity. The court denies both motions, however, as they apply to plaintiffs' Second Cause of Action based on Pembroke Hill as a similarly situated entity.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 39) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** plaintiffs' Motion for Summary Judgment (Doc. 41) is denied.

**IT IS SO ORDERED.**

**Dated this 30th day of August, 2018, at Kansas City, Kansas.**


**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**



St. Rose Church

Proposed
Meeting
House

51st Street

Pembroke Hill's
Property

State Line Road

Rainbow Boulevard

UKHA
Parking
Lot